# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 22 2019, 6:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joann M. Price
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of Involuntary Termination of the Parent-Child Relationship of:

M.R., M.D., and A.D. *(Minor Children)*

and

D.D. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner,*

and

January 22, 2019

Court of Appeals Case No.
18A-JT-1960

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Judge

Trial Court Cause Nos.
45D06-1705-JT-126
45D06-1705-JT-127
45D06-1705-JT-128

Lake County Court Appointed
Special Advocate

*Co-Appellee, Court Appointed
Special Advocate.*

**Robb, Judge.**

# Case Summary and Issue

D.D. ("Mother") appeals the juvenile court's termination of her parental rights to M.R., M.D., and A.D., raising only one issue for our review which we restate as whether the juvenile court's termination of her parental rights was clearly erroneous. Concluding the termination of Mother's parental rights was not clearly erroneous, we affirm.

# Facts and Procedural History

M.R. was born to Mother on January 8, 2013, followed by M.D. on August 5, 2014, and A.D. on December 16, 2015 (collectively the "Children").[1] Three

---

[1] M.R. and M.D. share the same father while A.D.'s father was initially unknown. A.D.'s father was eventually located and both fathers were appointed counsel. Neither father participated in the underlying proceedings and the juvenile court terminated their parental rights. Since neither father participates in this appeal, we recite only the facts pertinent to Mother.

days after A.D.'s birth, on December 19, the Indiana Department of Child Services ("DCS") received a report alleging that Mother had tested positive for opiates and amphetamine while she was pregnant with A.D., that A.D. had tested positive for opiates at birth, and that A.D. was exhibiting signs of withdrawal.

[3] After Mother was discharged,[2] a DCS family case manager, Areca Griggs, met with Mother and spoke to her about the allegations. Mother denied any drug use other than methadone. However, in addition to methadone, Mother's saliva drug screen tested positive for amphetamine and opiates. The two older children, M.R. and M.D., were not at Mother's home at the time so Griggs scheduled an appointment to return. Mother was not there when Griggs returned, and Mother later admitted that she had left M.R. and M.D. in the care of their paternal grandmother.

[4] On January 6, 2016, the Children were removed from Mother's care due to her ongoing drug use.[3] On January 7, DCS filed a petition alleging the Children were children in need of services ("CHINS"), and the juvenile court held an initial hearing authorizing the Children's continued removal. With that order, the juvenile court also required Mother to complete random drug screens, a substance abuse evaluation, a parenting assessment, an initial clinical

---

[2] A.D. remained in the Neonatal Intensive Care Unit ("NICU").

[3] M.R. and M.D. were initially placed in foster care but returned to their paternal grandmother once DCS completed a background check. A.D. remained in the NICU.

assessment, to receive supervised visitations and home-based services, and to follow any corresponding recommendations. *See* State's Exhibits A to Z at 128-29. The Children were adjudicated CHINS on May 12.

[5] From April 2016 until August 2017, Mother was provided supervised visitation with Asencia Sanchez at Higher Dimensions Incorporated ("HDI"). At Mother's request, visitations were held twice a week for a total of four hours instead of the eight hours specified on the referral. Sanchez testified that while these visits "always started out good . . . towards the end of the visit, [Mother] was just frustrated." Transcript, Volume II at 66. Mother's attendance at these visitations was "inconsistent" but "she attended more than she missed." *Id*. at 66-67. Sanchez characterized Mother's approach with the Children as "aggressive[,]" and recalled that Mother would occasionally threaten the Children that she would "whoop [their] a**[,]" despite being asked to stop doing so. *Id*. at 71, 69. Sanchez also reported that Mother's nickname for the Children was "slaves" while referring to herself as "their master." *Id*. at 70.

[6] A.D. has dealt with severe food allergies since birth. These allergies include peanuts, tree nuts, soy, and most seeds including poppy and sesame seeds. Soy causes A.D. gastrointestinal issues and A.D. carries an Epi Pen to treat a potential anaphylactic reaction to her other allergies. Despite Mother's awareness of these allergies and knowledge of A.D.'s sugar free diet, Mother would "sneak[] [A.D.] Cheetos or . . . macaroni and sugar." *Id*. at 71. A.D.'s foster mother testified that A.D. "would come home from visitations hurled over in pain. She would stay up all night. She would scream. She would have

meltdowns." *Id*. at 53. M.R. and M.D. had no such dietary restrictions but also exhibited negative effects of visits with Mother. Sanchez testified that "[w]hen it was bad, it was really, really bad." *Id*. at 76. On the "really bad times," Sanchez was afraid to put the Children in the car because she was afraid "they were crying so hard that they would choke." *Id*.

[7] During a visit on June 7, 2017, Mother tested positive for heroin, morphine, and hydrocodone and Sanchez requested that supervised visitation with Mother be terminated. On July 27, DCS formally requested that visitations be discontinued based on concerns that Mother had attended many visits "high and incoherent" and that "Mother's random drug screens at her last four visits were positive for either methadone, hydrocodone or heroin." State's Exhibits AA to ZZ at 85. The juvenile court subsequently terminated supervised visitations. Overall, Sanchez testified that these visits were unsuccessful "[b]ecause [Mother's] duration with them was two hours and . . . more often than not, it ended negatively." Tr., Vol. II at 70.

[8] Sanchez also provided services to Mother in order to assist her with housing and employment. It was difficult for Sanchez to arrange visits with Mother but Mother eventually secured employment at a Speedway and housing with her

mother.[4] Mother completed a parenting assessment[5] and parenting classes but "slowly digressed and quit using what was offered" or "suggested." *Id.* at 65.

[9] Mother admits she has struggled with opiate addiction but denies that she has a substance abuse problem. Although Mother initially completed a substance abuse evaluation by Eugene Wilson at Apostolic and was referred to substance abuse therapy, Mother did not attend therapy on a consistent basis and failed to complete an inpatient treatment program, as recommended by Wilson. Mother submitted to drug screens inconsistently and tested positive for opiates and/or other illegal substances on twelve occasions. *See* State's Exhibits A-Z at 26-93. Between November 20, 2017 and March 2, 2018, Mother failed to submit to any drug screens at all. When she finally resumed screening on March 2, she tested positive for tramadol and synthetic marijuana, alcohol on March 8, and synthetic marijuana on May 24, before producing two negative screens on June 1 and June 6.

[10] DCS filed a verified petition for the termination of parent-child relationship between Mother and the Children and the juvenile court conducted a fact-finding hearing on June 19, 2018. After taking the matter under advisement, the juvenile court granted the petition and terminated Mother's rights through

_____

[4] Maternal grandmother, however, also struggles with substance abuse issues.

[5] It is unclear as to when this assessment was completed or what recommendations were made, if any.

written findings of fact and conclusions of law issued on July 16, 2018, concluding, in relevant part:

> Mother would not make herself available for the drug screens through the service provider, Redwood. Mother did not submit to any drug screens in the year 2016. The case manager would attend the visitations in 2017 that [M]other had with her [C]hildren to drug screen the [M]other. Mother would consistently test positive on the drug screens that she would submit to with the case manager.

> Mother was inconsistent with the visitations with the [C]hildren. Mother would be inappropriate with the service providers and would curse at the providers. Mother had recurring issues with controlling her temper and her language at the visitations. The [M]other would call the [C]hildren names and would be inappropriate with her interactions with the [C]hildren. Mother's lack of control over her temper was a recurring issue at the visitations. Mother would become aggravated with the [C]hildren. Mother would have to be redirected on numerous occasions with her interactions with the [C]hildren. The visitations were very stressful on the [C]hildren and would often times have to be consoled by the transportation provider when the [C]hildren would become upset after the visitations. [A.D.] does not know who the parents are and does not have any significant bond with either parent. [A.D.] has never seen her father . . . . [M.R. and M.D.] do not have a healthy relationship with the [M]other. Mother's approach to the [C]hildren is aggressive in nature and the [C]hildren have no significant bond to the [M]other. Due to [M]other's inconsistency with attending the visitations, behavior at the visits and continued drug usage, visitations were stopped in August of 2017.

> Mother did not complete her substance abuse assessment. Mother did not consistently make herself available for the drug

screens. Mother was offered substance abuse services, but [M]other did not avail herself to the services. Mother is non—compliant with the case plan for reunification. Mother has made marginal effort in participating in the case plan. Mother has not remedied the reasons for removal or the reasons for continued out of home placement. Mother has not addressed her substance abuse issues, nor has [M]other participated in any substance abuse treatment.

* * *

Mother by her own testimony indicated that she cannot afford independent housing and is residing with her mother. Mother testified that the visitations with her [C]hildren were stressful due to being held at a facility, although the court notes [M]other has never progressed to unsupervised visits with her [C]hildren. Mother testified that she is now planning on entering a substance abuse program, although her [C]hildren have been wards in out of home placement since January of 2016. Mother furthered testified that she does not have a substance abuse problem. Although the court applauds [M]other on her verbal attempt at treatment for her substance abuse issues, the court must 1ook at the best interest of these [C]hildren. Delaying permanency for the possibility of [M]other beginning and completing services outlined in the case plan is not in these [C]hildren's best interests. Mother was given over two years and has not progressed in any portion of the case plan. After two and a half years, Mother continues to struggle with her substance abuse issues. After two and a half years, [M]other is no closer to reunification with her [C]hildren.

All efforts attempted to obtain reunification with any of the parents have failed. The [C]hildren have remained out of parental care. The [C]hildren have bonded in their current placements and removal of these [C]hildren from their current placements would be detrimental to these [C]hildren's well—

beings. The best interest of these [C]hildren is continued placement in their current placements.

No parent is providing any emotional or financial support for the [C]hildren. No parent has completed any case plan for reunification. No parent is in a position to properly parent these [C]hildren. The [C]hildren are bonded and thriving in their placements.

The [C]hildren remain outside of the parents' care. The original allegations of neglect have not been remedied by the parents. None of these parents have demonstrated an ability to independently parent the [C]hildren and provide necessary care, support and supervision. The Court finds no basis for assuming any of the parents will complete the necessary services and find one or all of themselves in a position to receive the [C]hildren back into the home. The parents failed to utilize the available services and make the necessary efforts to remedy the conditions, which led to intervention by DCS and the Court.

The [C]hildren continue to reside in a stable foster homes which has [sic] indicated both a willingness and ability to adopt all the [C]hildren. Although the [C]hildren are in separate homes, the [C]hildren maintain contact with each other. It would be unfair to the [C]hildren to delay such permanency on the very remote likelihood of the parents committing to and completing services.

There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the [C]hildren in that: for the reasons stated above. Additionally, the [C]hildren deserve a loving, caring, safe, stable and drug free home.

It is in the best interest of the [C]hildren and his [sic] health, welfare and future that the parent-child relationship between the

[C]hildren and his [sic] parents be forever fully and absolutely terminated.

[DCS] has a satisfactory plan for the care and treatment of the [C]hildren which is Adoption by Grandmother, [for M.R. and M.D.]; Adoption by the foster parents [for A.D.].

Appellant's Appendix, Volume 2 at 3-5. Mother now appeals.

# Discussion and Decision

## Termination Order

The only issue presented for our review is whether the termination of Mother's parental rights was clearly erroneous. We note that a parent's interest in the care, custody, and control of his child is "perhaps the oldest of the fundamental liberty interests[,]" *Bester v. Lake Co. OFC*, 839 N.E.2d 143, 147 (Ind. 2005), and these rights are protected by the Fourteenth Amendment to the United States Constitution, *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. Although these rights are constitutionally protected, they are not without limitation, and the law provides for the termination of the parent-child relationship when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

## A. Standard of Review

We do not reweigh the evidence or judge the credibility of witnesses when reviewing the termination of parental rights. *In re D.D.,* 804 N.E.2d at 265.

Rather, we consider only the evidence, and reasonable inferences therefrom, most favorable to the judgment, *id.*, and we will only set aside the court's judgment terminating a parent-child relationship when it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002).

[13] As required by Indiana Code section 31-35-2-8, the juvenile court entered findings of fact and conclusions thereon when terminating Mother's parental rights. We therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We must first determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Id.* Findings will only be set aside if they are clearly erroneous and findings are clearly erroneous only "when the record contains no facts to support them either directly or by inference." *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind. 1997).

## B. Termination of Mother's Parental Rights

[14] To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires the State to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove the foregoing elements by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009).

[15] "[I]f the court finds that the allegations in a petition described in [Indiana Code section 31-35-2-4(b)(2)] are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Here, the juvenile court found that the State proved both subsections (i) and (ii) of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence. Mother now challenges those findings.[6]

---

[6] Notably, Mother does not challenge the juvenile court's findings that termination is in the best interests of the Children and that there is a satisfactory plan for the care and treatment of the Children. We therefore

[16] Mother contends the State failed to prove by clear and convincing evidence the conditions resulting in the Children's removal will not be remedied. In determining whether the conditions that resulted in a child's removal will not be remedied,

> we engage in a two-step analysis. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

*In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014) (citations, quotations, and footnote omitted).

[17] Here, the Children were initially removed from Mother's care on January 6, 2016, due to Mother's drug use while she was pregnant with A.D. The Children have never returned to Mother's care.

---

accept these findings as true. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) ("Father does not challenge these findings and we accept them as true.").

[18] In challenging the juvenile court's conclusion on this issue, Mother argues the court "failed to take into consideration any evidence of changed conditions presented at the fact finding [hearing]." Appellant's Brief at 9. In support of her argument, Mother cites her own testimony that she "was no longer taking prescription drugs and that she no longer required methadone. In fact, Mother indicated [t]hat she had not had methadone in a year prior to the fact finding [hearing]." *Id.* Mother also produced evidence that she completed a seven-day detox program in May 2018.

[19] We begin by noting the requirement that juvenile courts consider evidence of changed conditions does not preclude a conclusion that the parent's past behavior is the best predictor of the future. *In re E.M.*, 4 N.E.3d at 643. The record reveals that during the underlying CHINS case, Mother was inconsistent in submitting to drug screens, and when she did submit to screens, she often tested positive for opiates and other illegal substances. *See* State's Exhibits A-Z at 26-93 (indicating Mother failed over twelve drug screens). Although Mother's most recent drug screens were either entirely negative or positive only for synthetic marijuana, Mother failed to complete a drug screen for the immediately preceding three to four-month period. *See id.* at 94-95; Tr., Vol. II at 110 (testimony by the family case manager that prior to Mother's screens within a week and a half before the fact-finding hearing, Mother had not produced a screen for three to four months).

[20] To the extent Mother now relies on her participation in a seven-day detox program, we agree that her willingness to complete such a program is indeed

progress. Viewed in the context of this case and Mother's history of substance abuse, however, the extent of that progress is minimal. *See, e.g., Thompson v. State,* 804 N.E.2d 1146, 1149 (Ind. 2004) (a factfinder is not obliged to credit a party's testimony or assign evidence the same value as a party does). This is further evidenced by the fact that after completing the detox program, Mother failed yet another drug screen, testing positive for tramadol and synthetic marijuana a week before the fact-finding hearing. Tr., Vol. II at 108, 140.

[21] Furthermore, contrary to Mother's assertion, our review of the record reveals that the juvenile court did, in fact, take into consideration Mother's recent efforts. The juvenile court stated it "applauds [M]other on her verbal attempt at treatment for her substance abuse issues" but ultimately concluded "[a]fter two and a half years, [M]other is no closer to reunification with her [C]hildren." Appellant's App., Vol. 2 at 4. We agree. And while we also commend Mother's recent progress and participation in a detox program, the overwhelming evidence of Mother's history far outweighs those recent efforts. Therefore, in the absence of any prolonged effort or even Mother's acknowledgment of her substance abuse issues, we conclude the juvenile court was well within its discretion to "disregard the efforts Mother made only shortly before termination and to weigh more heavily Mother's history of

conduct prior to those efforts." *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1234 (Ind. 2013) (quotation and citation omitted).[7]

# Conclusion

[22] The juvenile court's conclusion that the conditions that led to the removal of the Children would not be remedied was not clearly erroneous. We therefore affirm the order of the juvenile court terminating Mother's parental rights.

[23] Affirmed.

Riley, J., and Kirsch, J., concur.

---

[7] Mother also challenges the juvenile court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the Children. As noted, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element be proven to terminate Mother's parental rights. *See In re I.A.*, 903 N.E.2d at 153. Therefore, having concluded the evidence is sufficient to show a reasonable probability that the conditions resulting in Children's removal will not be remedied, we need not address Mother's argument on this issue.